AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

## for the
### Eastern District of Virginia

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

Mini U Storage Facility, Unit 536
7711 Loisdale Road
Springfield, VA 22150

)
)
)
)
)
)

Case No.  1:17sw16

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
Mini U Storage Facility, Unit 536, located at 7711 Loisdale Road, Springfield, Virginia 22150, as more particularly described in Attachment A

located in the _____ Eastern _____ District of _____ Virginia _____ , there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B of the attached Affidavit, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Sections 371, 2342 | Conspiracy to Traffic in Contraband Cigarettes |
| 31 U.S.C. Section 5324 | Structuring |
| 31 U.S.C. Section 5331 | Failure to File Form 8300s |

The application is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

TFO Jennifer Elliott, Special Deputy U.S. Marshal
*Printed name and title*

Sworn to before me and signed in my presence.

/s/
Theresa Carroll Buchanan
United States Magistrate Judge

Date: _____ 01/19/2017 _____

*Judge's signature*

City and state:  Alexandria, Virginia _____

Theresa Carroll Buchanan, United States Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

|  |  |  |
|---|---|---|
| IN RE: SEARCH WARRANT | )<br>)<br>) | No.   1:17 sw \6 |

## ORDER TO SEAL

The UNITED STATES, pursuant to Local Rule 49(B) of the Local Criminal Rules for the United States District Court for the Eastern District of Virginia, having moved to seal the application for a search warrant in this matter; and

The COURT, having found that revealing the material sought to be sealed would jeopardize an ongoing criminal investigation; having considered the available alternatives that are less drastic than sealing, and finding none would suffice to protect the government's legitimate interest in concluding the investigation; and finding that these legitimate interests outweigh at this time any interest in the disclosure of the material; it is hereby

ORDERED, ADJUDGED, and DECREED that the application for a search warrant (including the affidavit in support of that application) be sealed until the United States moves to unseal.

/s/
Theresa Carroll Buchanan
United States Magistrate Judge

THERESA CARROLL BUCHANAN
UNITED STATES MAGISTRATE JUDGE

Date: 1\19\17
Alexandria, Virginia

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

IN RE: SEARCH WARRANT      )
                             )        No.  1:17sw 16
                             )

## GOVERNMENT'S MOTION TO SEAL THE AFFIDAVIT IN SUPPORT OF SEARCH WARRANT APPLICATION PURSUANT TO LOCAL RULE 49(B)

Pursuant to Local Rule 49(B) of the Local Criminal Rules for the United States District Court for the Eastern District of Virginia, the United States asks for an Order to Seal the application for a search warrant (including the affidavit in support of that application), until the United States makes a motion to unseal it.

I.        REASONS FOR SEALING (Local Rule 49(B)(1))

Premature disclosure of the application for the warrant and the affidavit in support of the application may jeopardize an ongoing criminal investigation by revealing to targets of the investigation not only how much the investigators know, but also how much they do *not* know. Revelation to the targets of an investigation of what the investigators do *not* know may lead such targets to destroy evidence, tamper with potential witnesses not yet interviewed by investigators, or shape their own stories to hide what the investigators do not know.

**II.    REFERENCES TO GOVERNING CASE LAW** (Local Rule 49(B)(2))

"The trial court has supervisory power over its own records and may, in its discretion, seal documents if the public's right of access is outweighed by competing interests." *In re Knight Pub. Co.*, 743 F.2d 231, 235 (4th Cir. 1984).  The Court has the inherent power to seal affidavits in support of warrants to protect an ongoing investigation. *Times Mirror Company v. United*

*States*, 873 F.2d 1210, 1213 n.3 (9th Cir. 1989).  Sealing warrant applications is appropriate

where there is a substantial probability that release of the sealed documents would compromise

the government's on-going investigation.  *Media General Operations, Inc. v. Buchanan*, 417 F.3d

424, 430-31 (4th Cir. 2005).  *See e.g. In re Search Warrant for Secretarial Area Outside Office*

*of Gunn*, 855 F.2d 569, 574 (8th Cir. 1988).

      Sealing should be narrowly tailored to balance the values furthered by sealing (including

the protection of ongoing criminal investigations) against the values furthered by unsealing

(including the enhancement of the public's ability to evaluate the performance of the

investigators).  *Baltimore Sun v. Goetz*, 886 F.2d 60, 65-66 (4th Cir. 1989).  In this case, the

investigation cannot be protected without sealing the application.

## II.    PERIOD OF TIME GOVERNMENT SEEKS TO HAVE MATTER REMAIN UNDER SEAL (Local Rule 49(B)(3))

      Pursuant to Local Rule 49(B)(3), the application for a search warrant should remain

sealed until the United States moves to unseal it.

      WHEREFORE, the United States respectfully requests that the application for a search

warrant (including the supporting affidavit) be sealed until the United States moves to unseal.

                          Respectfully submitted,

                          Dana J. Boente
                          United States Attorney

By:                      _____

                          Gordon D. Kromberg
                          Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| IN RE: SEARCH OF: | ) | |
| | ) | |
| MINI U STORAGE FACILITY, | ) | No. 1:17sw 16 |
| UNIT 536 | ) | |
| 7711 LOISDALE ROAD, | ) | **UNDER SEAL** |
| SPRINGFIELD, VIRGINIA 22150 | ) | |

Affidavit in Support of Application for Search Warrant

I, Jennifer Elliott, being duly sworn, depose and state as follows:

1.     I am a Police Detective with the City of Falls Church Police, where I have been employed for over twenty years. During my employment with the City of Falls Church Police, I have investigated numerous types of crimes, including but not limited to homicide, robbery, forgery, embezzlement, fraud, and larceny. I have received specialized training in areas to include, but not limited to digital evidence, computer crimes, money laundering, and the preparation and execution of search warrants. Your Affiant has obtained convictions as a result of investigations in the State of Virginia. Since March of 2016, I have been assigned to the High Intensity Drug Trafficking Area (HIDTA) Task Force in Annandale, Virginia, on a project investigating possible money laundering, structuring, and other illegal financial activity, specifically, violations of 18 U.S.C. §§ 1956, 1957, and 1960, and 31 U.S.C. §§ 5316, 5324, and 5330. I am currently deputized by the United States Marshals Service in support of this project.

2.     This affidavit supports an application for a warrant to search Mini U Storage Facility, Unit 536, located at 7711 Loisdale Road in Springfield, Virginia 22150 (hereinafter "the SUBJECT LOCATION").

3.        The facts and information contained in this affidavit are based upon my personal

knowledge, information obtained from state and federal law enforcement officers, and

information provided by cooperating witnesses.

4.        Based on my training and experience and the facts as set forth in this affidavit,

there is probable cause to believe that violations of Title 18, United States Code, Sections 371

and 2342; and Title 31, United States Code, Sections 5324 and 5331, have been committed by

Bernard EKELEMU and others both known and as yet unknown.  There is also probable cause to

believe that evidence and instrumentalities of those crimes, as more specifically described in

**Attachment B,** may be found within the SUBJECT LOCATION, which is more particularly

described in **Attachment A.**

## PROBABLE CAUSE

5.        Records from the State of Maryland, Department of Assessments and Taxation

reflect that Rebecca Moore (date of birth 09/27/56) registered Jivrom Fuel LLC, Glen Burnie,

Maryland on October 13, 2011.  The Articles of Organization reflect that Rebecca Moore filed

for the State of Maryland, and detailed the business purpose as a gas station, a retail and

wholesale business, and a convenience store.  The Commonwealth of Virginia issued a

Certificate of Registration for the Collection of Virginia Sales and Use tax to Jivrom Fuel, LLC

on March 10, 2014.  The business name listed on that certificate was "Gulf Gas Station," located

at 5318 Jefferson Davis Highway, Fredericksburg, Virginia.  An application filed with the

Virginia Alcohol Beverage Control (ABC), dated June 5, 2014, listed Jivrom Fuel LLC as an

applicant for an operation license at the same address, at 5318 Jefferson Davis Highway,

Fredericksburg, Virginia.  The name of the business listed on that application was "Tobacco

County Chevron." The application was signed by Rebecca Moore and listed her as the president

of the company. Although Tobacco County Chevron / Gulf Gas abruptly closed on November 3, 2016, business memberships created on behalf of Jivrom Fuel continued to be used, at least through late November, to make bulk purchases of cigarettes from wholesale distributors.

6.      Jivrom Fuel LLC opened bank accounts at several banks in Virginia. These account opening documents reflect the owner/president as Rebecca Moore, with an additional signor, Bernard EKELEMU (date of birth October 26, 1956). Although Rebecca Moore opened these business accounts, the vast majority of business activities completed on behalf of Jivrom Fuel LLC were in fact conducted by Bernard EKELEMU.

7.      The SUBJECT LOCATION is believed to contain evidence and instrumentalities of violations of Title 31 U.S. Code § 5331 (Reports relating to coins and currency received in nonfinancial trade or business); Title 31 U.S.C. § 5324 (Structuring); Title 18 U.S.C. § 371 (Conspiracy to Traffic Contraband Cigarettes); and Title 18 U.S.C. § 2342 (Trafficking Contraband Cigarettes).

8.      This affidavit does not and is not intended to include every fact and matter observed by or known to the United States, only those sufficient to establish probable cause that evidence and instrumentalities of the above-described violations will in fact be located at the SUBJECT LOCATION, as more particularly described in **Attachment A**.

I.   **Relevant Statutes and Regulations**

A. **Title 31 U.S.C. § 5313 – Currency Transaction Reports**

9.      31 U.S.C. § 5313 and related regulations require any financial institution that engages with a customer in a currency transaction in excess of $10,000 to report that transaction to the United States Department of the Treasury on a form known as a Currency Transaction Report ("CTR"). A financial institution is required by regulation to treat multiple transactions as a

3

single transaction if the financial institution has knowledge that the transactions are conducted by, or on behalf of, the same person, and they result in either currency received or disbursed by the financial institution totaling more than $10,000 during any one-business day.

10.     CTRs are used by law enforcement to uncover a wide variety of illegal activities including tax evasion, narcotics trafficking, cigarette trafficking and money laundering. Many individuals involved in these illegal activities that plan to deposit (or withdraw) more than $10,000 in cash at a bank are aware of these reporting requirements and take active steps to try to cause such institutions to fail to file CTRs with respect to their transactions. These active steps are often referred to as "structuring" and involve engaging in multiple cash transactions in amounts of $10,000 or less, instead of engaging in one cash transaction of more than $10,000 at one time. Structuring is prohibited by 31 U.S.C. § 5324.

11.     I am advised that, to prove the crime of structuring transactions to evade reporting requirements, the government need not prove that an individual engaging in structuring knows that his activity is illegal. *United States v. Ahmad*, 213 F.3d 805, 809 (4th Cir. 2000). Instead, the government must establish only that an individual structured or attempted to structure a transaction with a domestic financial institution for the purpose of evading the reporting requirements of 31 U.S.C. § 5313, or any regulation prescribed under that section.

**B.   Title 31 U.S.C. § 5331 – Form 8300 Avoidance**

12.     Title 31 U.S.C. § 5331 and related regulations require that certain financial transaction information be reported to the IRS and the Financial Crimes Enforcement Network (FinCEN) by way of a Form 8300. The statute requires that a Form 8300 be filed by a person engaged in a trade or business when that business receives more than $10,000 in cash in one transaction or in two or more related transactions. Transactions are considered related even if they occur over a

4

period of more than 24 hours if the business recipient knows, or has reason to know, that each cash transaction is actually one of a series of connected transactions. A business must keep a copy of each such filed Form 8300 for five years from the date of filing. For purposes of this statute and related regulations, "cash" constitutes

- U.S. and foreign coin and currency; or
- A cashier's check, money order, bank draft, or traveler's check having a face amount of $10,000 or less when the business recipient knows that the instrument is being used in an attempt to avoid the necessity of a Form 8300 completion.

13.     Form 8300s are used by law enforcement to uncover a wide variety of illegal activities including tax evasion, narcotics trafficking, cigarette trafficking and money laundering. Many individuals involved in these illegal activities that plan to high-volume cash transactions are aware of these reporting requirements and take active steps to try to avoid the requirement that the businesses involved in these transactions file a Form 8300. These active steps are often referred to as "structuring" and involve engaging in multiple cash transactions in amounts of $10,000 or less, instead of engaging in one cash transaction of more than $10,000 at one time. As with CTR avoidance, this type of structuring is prohibited by 31 U.S.C. § 5324.

### C. Title 18 U.S.C. §§ 371, 2342 – Trafficking in Contraband Cigarettes

14.     Title 18 U.S.C. § 2342 criminalizes cigarette trafficking – that is, the transportation and sale of contraband cigarettes. Cigarettes are manufactured with a tax stamp for the state in which they are to be distributed. Transporting more than 10,000 cigarettes from the state in which they are tax stamped to another state without obtaining the proper license or tax stamps for that state in which they are to be sold causes those cigarettes to become, under 18 U.S.C. § 2341, contraband cigarettes. A conspiracy to traffic contraband cigarettes would involve making overt

acts in furtherance of the activity; for example, receiving and filling orders from customers located in states north of Virginia, such as Maryland or New York, or knowingly selling cigarettes to individuals who intend to resell those contraband cigarettes outside of Virginia.

## II.    Accounts Involving Cash Structuring

15.    This investigation has uncovered seven financial accounts utilized by Jivrom Fuel LLC, also doing business as Tobacco Country Gulf, located at 5318 Jefferson Davis Highway Fredericksburg, Virginia, since January of 2015.  Three accounts were active by way of deposits and disbursed funds.  These active Jivrom business bank accounts were maintained between three financial institutions: Navy Federal Credit Union, Bank of America and United Bank.

16.    Deposits into Bank of America and Navy Federal checking accounts totaled over $3 million from January 2015 through June 2016, and were completed primarily in cash, averaging approximately $160,000 per month.

17.    The high dollar cash amounts deposited into these Jivrom Fuel accounts do not match the Gulf Gas Station's business traffic as regularly observed by law enforcement.

18.    The United Bank account was opened on August 5, 2016 and appears to have been used solely to pay Layman Distributors, a full-service wholesale distributor located in Salem, Virginia.  Deposits into the United Bank account totaled $36,068.60.

19.    An analysis of 2015 and 2016 Bank of America records related to an account opened by Jivrom Fuel LLC reveals a pattern of apparent structured bank deposits under $10,000 to avoid currency reporting requirements, in violation of 31 U.S.C. § 5324(a).  These structured transactions occurred at the Bank of America Cosner's Corner branch, located at 10065 Jefferson Davis Highway, Fredericksburg, Virginia.  This branch is known to be located within a mile of Tobacco Country Gulf.  Your affiant and other law enforcement have reviewed records

6

maintained by Bank of America regarding checking account # 4460-2239-7067, held in the name of Jivrom Fuel LLC, for the period from January 2015 through June 2016. These records reflect that the account was opened on September 4, 2013, as a business checking account. The signatories on this account are Rebecca Moore and Bernard EKELEMU.

20.     During an eighteen-month period ending June 30, 2016, over $2.2 million was deposited into Bank of America checking account # 4460-2239-7067, with at least $1.9 million of those deposits consisting of cash. The pattern used to make most of the cash deposits, in my training and experience, indicates a concerted effort by Bernard EKELEMU to keep each "business day" deposit under $10,000. Over the time frame noted, 300 cash deposits were made, with only ten (10) of those deposits exceeding $10,000. Regardless of whether EKELEMU utilized a night deposit box at the bank or completed a teller transaction inside the bank, EKELEMU regularly kept the cash amounts he deposited into accounts below the CTR reporting threshold of $10,000.

21.     Law enforcement completed interviews with Bank of America officials at the Cosner's Corner branch. These bank officials were familiar with Bernard EKELEMU and his banking practices. They identified him through bank surveillance photographs and were able to identify his handwriting on deposit slips he provided through the night drop box or at a walk-up teller window. These bank officials associated only Bernard EKELEMU with the Jivrom Fuel bank account activity; they advised they were unfamiliar with Rebecca Moore.

22.     Deposits were made into Jivrom Fuel's Bank of America account # 4460-2239-7067 two to three times per week. The deposit pattern of individual cash deposits into account # 4460-2239-7067 reflect that some deposits were dated the same day but were broken into two (2) smaller deposits. Additionally, most of the deposit activity into this account consisted of

7

deposits recorded on a Monday.  These Monday deposits often contained bundles of as many as five or six separate deposits of cash, and were typically conducted through the Cosner's Corner branch's night deposit box.  Collectively, these deposits would significantly exceed $10,000 in cash, but would be broken down into increments between $8,000 and $9,800.  Bank of America officials explained that deposits made through their night deposit box over a weekend could potentially all be recorded the following Monday, even though they were not dropped off on that day.  In several instances, 6 or 7 cash deposit bundles may have covered a 3 to 4-day period. Instead of simply making a single cash deposit, EKELEMU undertook a time-consuming process to create numerous separate cash deposits, each below the $10,000 threshold.

23.     The following sub-paragraphs reflect three representative, documented instances of Jivrom Fuel's cash depositing practices (and are graphically depicted in **Chart A-1**).

    a.  On Monday January 12, 2015, four (4) separate deposits were recorded into checking account #4460-2239-7067 between approximately 8:54 am and 9:03 am. Deposit tickets were handwritten for these deposits. Two deposits were dated January 10, one was dated January 11, and one was dated January 12.  The total of these deposits was $37,267, but each single deposit was between $8,540 and $9,700. Additionally, an additional cash deposit of $9,500 was made on January 12 into Jivrom Fuel LLC's account at Navy Federal Credit Union.  Prior to these five (5) cash deposits that ostensibly covered Jivrom Fuel LLC's weekend activity, three *additional* cash deposits were made into Jivrom Fuel accounts on Friday, January 9, totaling $31,016 (involving a Navy Federal account and the Bank of America account).  In all, these eight (8) deposits totaled $77,783 cash.

b.  On Monday, April 20, 2015, five (5) separate deposits were made into Jivrom Fuel's

Bank of America checking account # 4460-2239-7067 between 11:57 am to 1:50

pm.  These five cash deposits totaled $43,454, and each single deposit was between

$5,657 and $9,734.  Deposit tickets were handwritten for these deposits.  One (1)

deposit ticket was dated March 17, one (1) was dated March 18, two (2) were dated

March 19, and one (1) was dated March 20.   Prior to this ostensibly weekend

activity, a cash deposit of $4,000 had been made into the Bank of America account

on Friday, March 17.

c.  On Monday, June 1, 2015, seven (7) separate deposits were made into Bank of

America checking account # 4460-2239-7067 between approximately 9:23 am to

4:33 pm.  Two (2) deposit tickets were dated May 29, one (1) was dated May 30,

two (2) were dated June 1, and two (2) were dated June 2.  These seven cash

deposits totaled $63,787, and each single deposit was between $8,300 and $9,740.

d.  In your affiant's training and experience, this deposit activity indicates that Bernard

EKELEMU intended to deposit over $10,000 in currency but employed a scheme to

break down the amounts in order to avoid exceeding that CTR threshold of $10,000

in a deliberate effort to avoid the filing of CTRs.

24.   Following cash deposits into this Bank of America account, money quickly left Jivrom

Fuel LLC's account to cover payments to cigarette distributors, to include "George J. Falter" and

"Century Distributors."  Those cigarette purchases consistently exceeded $10,000, indicating that

that the aggregate of the cash deposits into Bank of America account # 4460-2239-7067 was

intended to cover these specific purchases of bulk cigarettes.

9

10

## III. Form 8300 Reporting Violations

25.    An analysis of 2015 and 2016 records related to the business Jivrom Fuel LLC, also doing business as Tobacco County Chevron, located at 5318 Jefferson Davis Highway Fredericksburg, Virginia, reveals a pattern of structured cash payments for bulk cigarette purchases. This pattern reflects a deliberate attempt to avoid having the cigarette seller complete the required Form 8300 (as required by 31 U.S.C. § 5331 for cash transactions exceeding $10,000). Additionally, analysis of Jivrom Fuel LLC's purchase records reflect that business's further intent to break down cash purchase amount of cigarettes below $3,000.00 to avoid a

**Chart A1 – Bank of America account # 4460-2239-7067**

| Deposit Ticket Date | Bank Date | Time | Cash Deposit | Bank |
|---|---|---|---|---|
| 1/10/2015 | 1/12/2015 | 8:54 AM | $8,540.00 | Bk of America |
| 1/10/2015 | 1/12/2015 | 8:58 AM | $9,624.00 | Bk of America |
| 1/11/2015 | 1/12/2015 | 9:03 AM | $9,700.00 | Bk of America |
| 1/12/2015 | 1/12/2015 | 9:00 AM | $9,403.00 | Bk of America |
| | | | | |
| 4/17/2015 | 4/20/2015 | 11:58 AM | $9,413.00 | Bk of America |
| 4/18/2015 | 4/20/2015 | 12:00 PM | $5,657.00 | Bk of America |
| 4/19/2015 | 4/20/2015 | 11:57 AM | $9,734.00 | Bk of America |
| 4/19/2015 | 4/20/2015 | 12:01 PM | $9,635.00 | Bk of America |
| 4/20/2015 | 4/20/2015 | 1:50 PM | $9,015.00 | Bk of America |
| | | | | |
| 5/29/2015 | 6/1/2015 | 9:23 AM | $9,320.00 | Bk of America |
| 5/29/2015 | 6/1/2015 | 9:25 AM | $9,740.00 | Bk of America |
| 5/30/2015 | 6/1/2015 | 9:24 AM | $8,627.00 | Bk of America |
| 6/1/2015 | 6/1/2015 | 4:32 PM | $9,500.00 | Bk of America |
| 6/1/2015 | 6/1/2015 | 4:32 PM | $9,500.00 | Bk of America |
| 6/2/2015 | 6/1/2015 | 4:31 PM | $8,300.00 | Bk of America |
| 6/2/2015 | 6/1/2015 | 4:33 PM | $8,800.00 | Bk of America |

business practice specific to a certain wholesale distributor. This policy – under which the wholesaler filed Form 8300s for cash transactions exceeding $3,000 (versus the legal threshold of $10,000) – was intended to help combat contraband cigarette trafficking. Although Jivrom Fuel's efforts to avoid this lower Form 8300 threshold at this particular wholesaler may not be technically illegal, in your affiant's training and experience it is further evidence of EKELEMU's intent to avoid the filing of a Form 8300 that would provide information on his cash transactions to the federal government, and corroborative of the illicit purposes (as outline below) that EKELEMU had in mind for his bulk cigarette purchases.

26.    This pattern of structured cash purchases of bulk quantities of cigarettes by EKELEMU on behalf of Jivrom Fuel LLC are reflected in the sales records of the following companies:

- Century Distributors
- BJ's Wholesale Club
- Richmond Cash and Carry
- Costco Wholesale

27.    Century Distributors' records reflect that Jivrom Fuel applied for a business account on June 14, 2015. The application listed Rebecca Moore as the owner of the business. Century Distributors approved Jivrom Fuel for a business account, and credit terms were set as COD (cash on delivery).

28.    An official at Century Distributors reported that Bernard EKELEMU was the primary point of contact for all purchases Jivrom Fuel made with Century Distributors. Analysis of the cash purchases made by Jivrom Fuel at Century Distributers reflect a pattern of structuring. The records reflect at least one hundred thirty-one (131) purchases of cigarettes by Jivrom Fuel in

2015 and 2016. Of those 131 purchases, only *once* did Bernard EKELEMU tender over $10,000.00 in cash.

29.     The Century Distributors' invoices reflect that 50 of these 131 transactions totaled over $10,000 in total purchase price, but that EKELEUM limited the *cash* portion of the payment to under $10,000 – the remainder was paid by way of money orders or cashier's checks.

30.     Of the 131 purchases, 13 purchases were between $9,051.45 and $9,828.55, and 48 purchases were over $10,000.00, but paid for with a cashier's check instead of U.S. currency. Those cashier's checks had been previously obtained, with cash, from Jivrom Fuel LLC's account at Bank of America. The total purchased amount from Century Distributors by Jivrom Fuel was approximately $1,809,926.28.

31.     **Chart A2, Part I** represents purchases from Century Distributors that were over $10,000 and not paid exclusively with a Cashier's Check. These transactions reflect what appear to be deliberate efforts by Bernard EKELEMU to have no single cash payment exceed $10,000 (although the aggregate total collected did). Through my training and experience, such a pattern has no reasonable explanation other than a deliberate attempt to avoid having the business file a resultant Form 8300.

**Chart A2, Part I – Century Distributors**

| Date | Quantity of Cartons | Money Order | Cash | Total |
|------|---------------------|-------------|------|-------|
| 9/8/15 | 288 | $4,000.00 | $9,689.45 | $13,689.45 |
| 9/10/15 | 315 | $6,000.00 | $8,795.00 | $14,795.00 |
| 9/23/15 | 317 | $6,000.00 | $8,622.63 | $14,622.63 |
| 10/12/15 | 274 | $4,000.00 | $9,350.00 | $13,350.00 |
| 10/22/15 | 289 | $4,000.00 | $9,551.74 | $13,551.74 |
| 10/29/15 | 312 | $6,000.00 | $8,540.90 | $14,540.90 |
| 11/13/15 | 290 | $4,000.00 | $9,419.90 | $13,419.90 |

| 12/16/15 | 272 | $3,500.00 | $8,856.48 | $12,356.48 |
| 1/15/16 | 273 | $4,500.00 | $8,132.28 | $12,632.28 |
| 2/4/16 | 252 | $4,000.00 | $8,691.29 | $12,691.29 |

32.    **Chart A2, Part 2** shows 13 purchases completed by Jivrom Fuel for amounts

between $9,051.45 and $9,828.55. All 13 purchases fall just under the $10,000 threshold which

would trigger the filing of a Form 8300.

**Chart A2, Part 2 – Century Distributors**

| Date | Quantity of Cartons | Money Order | Cash | Total |
|------|------|------|------|------|
| 7/16/15 | 206 | $5,117.45 | $4,352.51 | $9,469.96 |
| 8/25/15 | 202 | | $9,470.52 | $9,471.52 |
| 10/23/15 | 190 | | $9,051.54 | $9,051.54 |
| 12/11/15 | 202 | | $9,554.78 | $9,554.78 |
| 1/5/16 | 202 | $2,500.00 | $6,977.32 | $9,477.32 |
| 1/20/16 | 184 | | $9,118.34 | $9,118.34 |
| 2/12/16 | 200 | | $9,828.55 | $9,828.55 |
| 2/18/16 | 197 | | $9,140.40 | $9,140.40 |
| 3/11/16 | 196 | | $9,407.07 | $9,407.07 |
| 4/13/16 | 192 | | $9,109.61 | $9,109.61 |
| 4/22/16 | 205 | | $9,522.00 | $9,522.00 |
| 5/3/16 | 200 | | $9,194.78 | $9,194.78 |
| 5/4/16 | 197 | | $9,333.24 | $9,333.24 |

33.    BJ's Wholesale Club records for Jivrom Fuel reflect an enrollment date (with BJ's) of

January 10, 2014, and a tax resale/tobacco purchasing account enrollment on October 28, 2014.

Rebecca Moore's name was provided on the Commonwealth of Virginia ST-10 (Virginia's Sales

and Use Tax exemption) form for Jivrom Fuel, LLC.  Upon registering as a business in the

Commonwealth, a business may use the Sales and Use Tax Certificate of Exemption to purchase

13

products without remitting the sales and use tax to the seller. BJ's membership records
document that Jivrom Fuel enrolled seven (7) members onto its account # 069-5-0345496. Of
these accounts, only two were actually utilized to make cigarette purchases from BJ's. Those
membership accounts were registered to Bernard EKELEMU and a Melford Ekelemu (believed
to be Bernard EKELEMU's son).

34.   BJ's surveillance videos reveal Bernard EKELEMU exiting the BJ's Wholesale Club
located at 3985 Plank Road, Fredericksburg, with bulk cigarette purchases that closely resemble
the point of sale records at that BJ's location. An analysis of the purchases made by Jivrom Fuel
at BJ's Wholesale Club in 2015 and 2016 reflect a pattern indicative of an effort to avoid the
Form 8300 filing requirement. Bernard EKELEMU either utilized a mixture of cash, money
orders, and credit/debit cards payments that – when aggregated – exceeded $10,000, but did not
include a cash component of more than $10,000, or limited his solely cash purchases to less than
$10,000.

35.   Out of Jivrom Fuel's 134 purchases at BJ's Wholesale Club, at least ten (10) reflect a
pattern of split payments that, when combined, exceed $10,000 per transaction. This practice of
mixed payments (with the cash portion limited to below $10,000) is reflected in **Chart A3**,
below.

36.   An additional 119 of those 134 total purchases were under $10,000, and 40 of those
119 purchases were between $9,346.00 and $9,949.83. An additional three (3) transactions
appear to have had some products *pulled back* from the sale to ensure the total cash purchase
price remained under $10,000.

**Chart A3 – BJ's Wholesale Club**

| Invoice# / Account name | Date | Time | BOA Jivrom Bank Check | Cash | Debit Card | Total |
|---|---|---|---|---|---|---|
| B Ekelemu 06950345496 | 4/16/15 | 1957 | | $9,800.00 | $1,991.20 | $11,791.20 |
| B Ekelemu 06950345496 | 4/17/15 | 2157 | | $9,800.36 | $2,443.00 | $12,233.37 |
| B Ekelemu 06950345496 | 4/25/15 | 2051 | $2,027.47 | $9,800.00 | | $11,791.20 |
| B Ekelemu 06950345496 | 5/1/15 | 1443 | $4,181.19 | $7,650.00 | | $11,791.20 |
| B Ekelemu 06950345496 | 5/14/15 | 2015 | $6,935.00 | $5,000.82 | | $11,791.20 |
| B Ekelemu 06950345496 | 5/15/15 | 1123 | $5,791.20 | $6,000.00 | | $11,791.20 |
| B Ekelemu 06950345496 | 5/22/15 | 1610 | $9,291.85 | $5,201.00 | | $15,950.49 |
| B Ekelemu 06950345496 | 7/18/15 | 1713 | | $9,500.18 | $6,756.00 | $16,226.10 |
| B Ekelemu 06950345496 | 7/25/15 | 1928 | | $6,917.45 | $12,800.00 | $19,712.86 |
| B Ekelemu 06950345496 | 9/24/15 | 1858 | $129.35 | $9,960.00 | | $10,034.00 |

37.    Records reflect that Jivrom Fuel LLC opened an account with Richmond Cash and Carry on July 25, 2015. The address provided as the business address was the Gulf Gas Station, 5318 Jefferson Davis Highway, Fredericksburg, Virginia. Richmond Cash and Carry's records indicate that a copy of Bernard EKELEMU's Maryland Driver's License was included with Jivrom Fuel LLC's application. The purchases made by Jivrom Fuel at Richmond Cash and Carry in 2016 were indicative of an effort to avoid the Form 8300 reporting requirement. Out of the thirty-six (36) cash transactions conducted between May 2016 and September 2016, thirty-five (35) were limited to less than $10,000.00. Twenty (20) of the thirty-six (36) transactions at Richmond Cash and Carry ranged between $9,125.87 and $9,980.91.

38.    Records reflect that Rebecca Moore filed a Virginia ST-10 Form for Jivrom Fuel, LLC with Costco Wholesale on March 10, 2014. Moore was listed as President of Jivrom Fuel, LLC. Several individuals purchased large quantities of cigarettes for Jivrom Fuel LLC on the business' Costco membership, to include Bernard EKELEMU, Melford Ekelemu, Hamid Mahgoub, and Felicia Allen. An analysis of Jivrom Fuel's cigarette purchases at Costco in 2015 and 2016 shows a pattern indicative of an intent to structure cash purchases in order to avoid the self-

15

imposed tobacco purchase limits set by the Fredericksburg Costco location, where Jivrom Fuel

purchased product. Costco officials explained to law enforcement that Costco created policies at

its high-volume tobacco sales stores that required Costco's employees at those locations to

complete Form 8300s for any cash purchase *over $3,000.00* (again, the currency threshold

established by 31 U.S.C. § 5331 is significantly greater, at $10,000). Costco explained to law

enforcement that its employees were instructed to informed customers of this policy when

customers purchased tobacco products.

39.     Of the three hundred four (304) documented Fredericksburg Costco cigarette

purchases completed by Jivrom Fuel, only nineteen (19) purchases exceeded $3,000.00. These

purchases, notably, were *not* conducted by Bernard EKELEMU, but instead by Hamid Mahgoub,

Melford Ekelemu, and Felicia Allen between January and July of 2015. Bernard EKELEMU's

cash purchases, by contrast, never exceeded Costco's $3,000.00 threshold for the filing of a

Form 8300.

## IV.     Contraband Cigarette Trafficking and the SUBJECT LOCATION

40.     In conjunction with the bank and purchase structuring violations, this investigation has

revealed an ongoing cigarette trafficking conspiracy involving Bernard EKELMU, Hamid

MAHGOUB, Felicia ALLEN, Melford EKELEMU, Rebecca MOORE, Ki Hin LEE and other

individuals both known and unknown to your affiant. Law enforcement surveillance has

regularly observed Bernard EKELEMU at the Gulf Gas Station at 5318 Jefferson Davis

Highway in Fredericksburg during business hours.

41.     Shortly after the purchase of the Gulf Gas station, Bernard EKELEMU began to

purchase large quantities of cigarettes using his Gulf Gas station's business license, as

documented above. Records reflect that in 2015 and 2016, Bernard EKELEMU used that

business license to purchase over $5,000,000.00 worth of Virginia-stamped cigarettes from the wholesale distributors and vendors previously listed in this affidavit. These bulk cigarette purchases were either delivered directly to the Gulf Gas Station by large wholesale dealers, such as George J. Falter, Liberty USA, and Century Distributors; or picked up by Bernard EKELEMU himself at Costco Wholesale, BJ's Wholesale Club, and Richmond Cash and Carry.

42.     Regular law enforcement surveillance of Bernard EKELEMU's business, Tobacco Country / Gulf Gas station, observed that the volume of Bernard EKELEMU's cigarette purchases are at odds with the customer traffic observed at Bernard EKELEMU's Gulf Gas station. Surveillance operations on different days of the week would span two hours at a time, and observe fewer than 20 customers visiting the Gulf Gas Station in that time span; those customers appear to have engaged in typical gas station purchases.

43.     Bernard EKELEMU has been living since September 5, 2016 at the Candlewood Suites Hotel, 4821 Crossings Ct., Fredericksburg, Virginia 22407. This facility provides long-term hotel-type accommodations, which does not afford renters large amounts of storage space.

44.     Law enforcement surveillance operations, bank records, and recorded covert video surveillance reveal that Bernard EKELEMU is utilizing a light gold Lexus SUV, Maryland license plate 8BA8107, to transport squared-off black trash bags that appear to contain boxes the same size and shape as cigarette cases from the Fredericksburg area to the SUBJECT LOCATION at the Mini U Storage Facility in Springfield, Virginia. Your affiant is aware that cigarette traffickers typically place cases of cigarettes in black trash bags in order to conceal their identity. Bank records indicate Bernard EKELEMU is renting the SUBJECT LOCATION at the Mini U Storage Facility, located at 7711 Loisdale Road, Springfield, Virginia 22150. Records reflect that this Unit (SUBJECT LOCATION) is Unit # 536, a 5' x 5' interior storage unit. The

Mini U Storage entrance gate log indicates that Bernard EKELEMU accessed the SUBJECT

LOCATION multiple times a month, and sometimes more than twice a week.

45.     On July 20, 2016, your affiant and another HIDTA NVFI task force officer

conducted surveillance operations on Bernard EKELEMU.  That surveillance observed:

   a.  Bernard EKELEMU leaving the Tobacco Country/Gulf Gas Station at

       approximately 1144 hours in the above-described gold Lexus SUV,

       subsequently driving south on Interstate 95.

   b.  Bernard EKELEMU was followed to Richmond Cash and Carry, a wholesale

       distributor in Richmond that sells bulk quantities of cigarettes at wholesale

       cost.  Law enforcement was unable to follow Bernard EKELEMU into the

       business.

   c.  Bernard EKELEMU then drove back to the Tobacco County/Gulf Gas station

       in Fredericksburg at approximately 1352 hours.

   d.  Bernard EKELEMU unloaded two cardboard boxes out of the gold Lexus

       SUV and moved those boxes into the Gulf Gas station.  One of those boxes

       had markings consistent with that of a case of cigarettes; the other box was

       similar in size and shape.  Records obtained from Richmond Cash and Carry

       show Bernard EKELEMU purchased 210 cartons of cigarettes ($9,964.60)

       that day, but only two cases – which typically each contain 30 cartons of

       cigarettes – were moved into Bernard EKELEMU's only legitimate business.

46.     Management of the Mini U Storage facility located at 7711 Loisdale Road,

Springfield, Virginia have explained to law enforcement that Bernard EKELEMU visited the

SUBJECT LOCATION every other Sunday, and sometimes on Tuesday or Thursday.

Management described Bernard EKELEMU's vehicle the above-described gold Lexus SUV.

Management also stated that a green Ford Astro, driven by a Hispanic male, would usually

follow Bernard EKELEMU into the Mini U storage facility during Bernard EKELEMU's

Sunday trips to the SUBJECT LOCATION. Your affiant subsequently received permission from

the Mini U Storage Facility managers to emplace video cameras on the facility's property.

Those cameras specifically monitor the SUBJECT LOCATION.

47.     On August 6, 2016, staff at the Mini U Storage Facility contacted law enforcement

and explained that Bernard EKELEMU was currently at the SUBJECT LOCATION with an

unknown black female. Review of the surveillance cameras emplaced at the facility revealed

that Bernard EKELEMU's gold Lexus SUV entered the facility at approximately 1417 hours,

trailed by another vehicle that appeared to be a silver-colored SUV. Bernard EKELEMU was

observed making eight (8) trips from the gold Lexus SUV to the SUBJECT LOCATION. On the

first seven (7) trips, Bernard EKELEMU can be observed carrying two trash bags in each hand;

on the eighth (8) trip, a single black trash bag. The black trash bags were squared off as before,

and appeared to contain boxes the same size and shape as cigarette cases.

48.     On August 7, 2016, staff at the Mini U Storage Facility contacted law enforcement,

explaining that Bernard EKELEMU was present at the SUBJECT LOCATION, and that an

individual driving a black Chevrolet Suburban, bearing New York State registration tags HEF

8360, had accompanied Bernard EKELEMU. Law enforcement surveillance camera footage

confirmed that both this black Chevrolet Suburban with New York license plates and the above-

described gold Lexus SUV (Maryland plates 8BA8107) arrived at the Mini U Storage Facility at

approximately 1912 hours. Shortly after their arrival, Bernard EKELEMU transported five (5)

squared-off trash bags from his gold Lexus SUV to the Chevrolet Suburban. After loading those

19

bags into the Chevrolet Suburban, Bernard EKELEMU loaded an additional fifteen (15) squared-off trash bags from the SUBJECT LOCATION into the Chevrolet Suburban. A total of twenty (20) separate squared-off trash bags moved from either Bernard EKELEMU's vehicle or the SUBJECT LOCATION into the Chevrolet Suburban with the New York registration. The driver of the Chevrolet Suburban and Bernard EKELEMU were then observed sitting in Bernard EKELEMU's vehicle from approximately 1935 hours to 2020 hours. During this time, the video shows that both men carefully inspected paperwork.

49.     Law enforcement has subsequently identified the driver of the Chevrolet Suburban as Ki Hin LEE, a New York resident whose two listed addresses are both located in Flushing, New York. **Appendix A** provides several representative screen grabs of surveillance footage of Bernard EKELEMU's and LEE's interactions at the SUBJECT LOCATION on the Mini U Storage facility in Springfield, Virginia.

50.     Video and GPS surveillance continued at the SUBJECT LOCATION and recorded numerous, regular transactions between EKELEMU and LEE in August and late November of 2016. Surveillance also observed Bernard EKELEMU loading cigarettes into the SUBJECT LOCATION at different occasions during this time frame. **Appendix A** also provides several representative screen grabs of surveillance footage of Bernard EKELEMU loading and unloading cases of cigarettes (concealed in black plastic trash bags) into the SUBJECT LOCATION at Mini U Storage.

51.     To cite only one example of Bernard EKELEMU's transfer of bulk quantities of cigarettes to LEE at the SUBJECT LOCATION: On Sunday, September 18, 2016, surveillance revealed Bernard EKELEMU transferring thirty-three (33) squared-off trash bags to LEE at the SUBJECT LOCATION at the Mini U Storage facility in Springfield. Because LEE's vehicle did

20

not have room for that entire amount of product, Bernard EKELEMU was forced to return two of the trash bags to the SUBJECT LOCATION.

52.     During Bernard EKELEMU's interactions with LEE, the pair can be observed exchanging what appear to be large amounts of U.S. currency following the transfer of black squared-off trash bags from the SUBJECT LOCATION to LEE's vehicle.

53.     Law enforcement has learned that on November 3, 2016, the Gulf Gas / Tobacco County Chevron abruptly ceased business operations; that business has since sat vacant. Despite the closure of the only potentially legitimate outlet for his bulk cigarette purchases, surveillance confirmed that Bernard EKELEMU did *not* stop making such bulk cigarette purchases on behalf of his (now closed) business at wholesale distributors. Among other purchases, GPS surveillance corroborated Richmond Cash and Carry records that reflect that on November 19, 2016, EKELEMU completed a bulk cigarette purchase from that wholesaler of more than 600 cartons of cigarettes.

54.  On January 12, 2017, your affiant followed-up with a representative from the Mini U Storage Facility. That representative confirmed that as of January 12, 2017, Bernard EKELEMU continued to maintain the SUBJECT LOCATION, and that EKELEMU's has kept his payments on the SUBJECT LOCATION up to date. That representative reported that the facility has received no indication or notice that Bernard EKELEMU plans to vacate the SUBJECT LOCATION. Bernard EKELEMU's most recent visit to the SUBJECT LOCATION was on December 14, 2016, at which time Bernard EKELEMU requested a change to his gate access code. In your affiant's training and experience, this action would represent an unusual and unnecessary request if EKELEMU had any plans to vacate the SUBJECT LOCATION in the immediate future.

55.   Based on the foregoing, your affiant respectfully submits that there is probable cause to believe that Bernard EKELEMU is involved in an ongoing conspiracy to traffic contraband cigarettes, in violation of 18 U.S.C. §§ 371 and 2342; and that in furtherance of this illicit enterprise, Bernard EKELEMU has also engaged in Structuring, in violation of 31 U.S.C. § 5324(a); and Form 8300 avoidance, in violation of 31 U.S.C. § 5331.

## VIII.   **Records Maintenance and Storage**

56.   Based on the foregoing, I respectfully submit that there is probable cause to believe that the SUBJECT LOCATION was used at various times further a conspiracy to traffic contraband cigarettes, in violation of 18 U.S.C. §§ 371 and 2342, and that U.S. currency, records, contact information, and other evidence related to that conspiracy (as more particularly described within **Attachment B**) will be found within the SUBJECT LOCATION (described more particularly in **Attachment A**).

57.   Based upon my training and experience, an individual who structures large amounts of cash keeps records of these transactions in a ledger book or on a computer, and will maintain, in their residence or places of business, the original receipt(s) obtained which reflect(s) the structured transactions, deposits and payments.   Based upon my training, experience, and participation in investigations involving violations of the Bank Secrecy Act, money laundering laws, and related offenses, I know that:

   a.   Individuals engaged in a trade or business commonly maintain books, records, and papers relating to the financial transactions and results of operating the business, whether the business is legal or illegal.   Such records routinely include sales records, invoices, receipts, notes, ledgers, bank account records, instruments, contracts, titles, warranties, lien information, journals, inventory records, loan applications, loan

22

payment records, and other financial records and papers, especially those relating to the receipt and transfer of business proceeds, including cash. Further, such records are often kept or maintained in close proximity to the individual(s) operating the business, such as the personal residence, business' location, automobile, safe deposit box, storage facility, or other location owned or controlled by the individual, and in a fashion in which the documents or records are readily available to that individual;

b. Individuals engaged in a trade or business also maintain financial documents and records relating to both their personal and business affairs over the course of several years, including bank records, financial statements, and tax returns. These documents often reveal the acquisition, conversion, movement, secreting, transfer, and disbursement of currency or currency equivalents. Such documents are often and normally retained for long periods of time, regardless of whether their value to the individual has diminished. Further, such documents are often maintained in the personal residence, business location, automobile, safe deposit box, storage facility, or other location owned or controlled by the individual, and in a fashion in which the documents are readily available to that individual;

c. Individuals who are involved in illegal activities, particularly those engaged in it for financial gain, frequently maintain evidence of their activities, to include currency, cashier's checks, money orders and other negotiable instruments, and documents or memoranda relating to the secreting of income. Such evidence is usually kept in their personal possession or other close personal control, such as their personal residence, vehicle, business location, or other near surrounding area. They also may keep such

evidence in the custodial care of a trusted friend or relative in similar areas personal to

that person;

d. Individuals engaged in illicit financial activities often retain documents indicating

control and ownership of assets and financial accounts held in either their own name or

in the names of others, and these documents are usually kept in a location deemed safe

from law enforcement and under the close, personal control of the individual, such as

their personal residence; and

e. Individuals who obtain valuable tangible property, including cash and precious metals,

in connection with illicit financial activities often store and maintain that property in a

location deemed safe from other individuals and under the close, personal control of

the individual, such as their personal residence.

## V. Electronic Records Contained on Computer Hardware, Associated Peripherals, and Other Digital Media

58. I know that computer hardware, digital storage media, smart phones, software,

documentation, passwords, and data security devices may be important to a criminal

investigation in two distinct and important respects: (1) the objects themselves may be

instrumentalities, fruits, or evidence of crime, and/or (2) the objects may have been used to

collect and store information about crimes (in the form of electronic data). Rule 41 of the

Federal Rules of Criminal Procedure permits the government to search and seize computer

hardware, software, documentation, passwords, and data security devices which are (1)

instrumentalities, fruits, or evidence of crime; or (2) storage devices for information about

crime.

a.  Computer hardware, meaning any and all computer equipment including any

electronic devices that are capable of collecting, analyzing, creating, displaying,

converting, storing, concealing, or transmitting electronic, magnetic, optical, or

similar computer impulses or data.  Included within the definition of computer

hardware is any data processing hardware (such as central processing units and self-

contained laptop, notebook computers, tablets, smart phones and cellular telephones

capable of text messaging or electronic communications); internal and peripheral

storage devices (such as fixed disks, external hard disks, floppy disk drives and

diskettes, tape drives and tapes, optical and compact disk storage devices, USB flash

drives and other digital memory storage devices; peripheral input/output devices

(such as keyboards, printers, scanners, plotters, video display monitors, and optical

readers); related communications devices (such as modems, cables and connections,

recording equipment, RAM and ROM units, acoustic couplers, automatic dialers,

speed dialers, programmable telephone dialing or signaling devices, and electronic

tone generating devices); and any devices, mechanisms, or parts that can be used to

restrict access to such hardware (such as physical keys and locks).

b.  Computer software, meaning any and all information, instructions, programs, or

program codes, stored in the form of electronic, magnetic, optical, or other media,

which is capable of being interpreted by a computer or its related

components.  Computer software may also include data, data fragments, or control

characters integral to the operation of computer software, such as operating systems

software, applications software, utility programs, compilers, interpreters,

communications software, and other programming used or intended to be used to
communicate with computer components.

c.   Computer-related documentation, meaning any written, recorded, printed, or
electronically-stored material that explains or illustrates the configuration or use of
any seized computer hardware, software, or related items.

d.   Computer passwords and data security devices, meaning any devices, programs, or
data -- whether themselves in the nature of hardware or software -- that can be used
or are designed to be used to restrict access to, or to facilitate concealment of, or
destruction of any computer hardware, computer software, computer-related
documentation, or electronic data records. Such items include, but are not limited to,
data security hardware (such as encryption devices, chips, and circuit boards);
passwords; data security software or information (such as test keys and encryption
codes); and similar information that is required to access computer programs or data
or to otherwise render programs or data into usable form, and any evidence
eliminator or data wiping software.

e.   Any computer or electronic records, documents, and materials, including those used
to facilitate interstate communications, in whatever form and by whatever means
such records, documents, or materials, their drafts or their modifications, may have
been created or stored, including, but not limited to, any hand-made form (such as
writing or marking with any implement on any surface, directly or indirectly); any
photographic form (such as microfilm, microfiche, prints, slides, negative, video
tapes, motion pictures or photocopies); any mechanical form (such as photographic
records, printing or typing); any electrical, electronic, or magnetic form (such as tape

26

recordings, cassettes, compact disks); or any information on an electronic or magnetic storage device (such as floppy diskettes, hard disks, CD-ROMs, optical disks, printer buffers, sort cards, memory calculators, electronic dialers, cellular telephones, or electronic notebooks), as well as printouts or readouts from any magnetic storage device.

f.   Any electronic information or data, stored in any form, which has been used or prepared for use either for periodic or random backup (whether deliberate, inadvertent, or automatically or manually initiated), of any computer or computer system.  The form such information might take includes, but is not limited to, floppy diskettes, fixed hard disks, removable hard disk cartridges, tapes, laser disks, CD-ROM disks, video cassettes, and other media capable of storing magnetic or optical coding.

59.   Based upon my knowledge, training, and experience, and the experience of other law enforcement personnel, I know that searches and seizures of evidence from computers commonly require Agents to seize most or all computer items (hardware, software, disks, and instructions) to be processed later by a qualified computer expert in a laboratory or other controlled environment for the following reasons:

a.   Digital storage devices (like hard disks, diskettes, CD-ROM disks, tapes, digital audiotapes (DAT), laser disks, USB Flash Drives, and digital media) can store the equivalent of thousands of pages of information. When the user wants to conceal criminal evidence, he or she often stores it in random order, with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take months, depending

on the volume of data stored, and it would be impractical to attempt this kind of data search on site.

b.  Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available require even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert would analyze the system. It is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (either from external sources or from destructive code imbedded in the system as a "booby trap"), the controlled environment of a laboratory is essential to its complete and accurate analysis.

c.  In order to fully retrieve data from a computer system, the analyst needs all magnetic storage devices as well as the central processing unit (CPU). In cases where evidence may consist of graphic files, the monitor, printer and all used printer cartridges are also essential to show the nature and quality of the graphic images which the system could produce.  In addition, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any application software, with all corresponding computer manuals which may have been used to create the data whether stored on hard drives or on external media.

60.  Throughout the investigation, law enforcement has confirmed that Bernard EKELEMU regularly uses a cellular telephone to conduct his cigarette trafficking activities. EKELEMU's telephone records indicate that EKELEMU has been in regular contact with telephone numbers

associated with both Ki Hin LEE and other individuals linked to EKELEMU's cigarette purchasing activity. Due to the geographically dispersed nature of cigarette trafficking – which in this case involves, e.g, EKELEMU rendezvousing with a New York-based courier at the SUBJECT LOCATION in Springfield, Virginia – the use of cell phones is essential to coordinating cigarette purchases, meeting points and times, and the details and pricing of the transfer of large quantities of cigarettes. Law enforcement has observed Bernard EKELEMU speaking on the cell phone during his meetings with Ki Hin LEE at the SUBJECT LOCATION, during the course of Bernard EKELEMU's and LEE's exchange of bulk cigarettes and apparent large sums of U.S. currency. Because digital storage devices, such as cellular telephones, thumb drives, and media storage cards, can be extremely small and specifically designed to appear as other innocuous objects, your affiant is seeking authority to search Bernard EKELEMU's person at the time of the search of the location listed in **Attachment A** for such storage devices and computers. If the computer – such as a cellular telephone – is portable and if Bernard EKELEMU is encountered outside of the location to be searched, your affiant seeks the authority to take any such computers or devices listed under this warrant from Bernard EKELEMU, even if he is not inside the location to be searched.

## Conclusion

61. Your Affiant respectfully submits that there is probable cause to believe that Bernard EKELEMU is engaged in cigarette trafficking, in violation of 18 U.S.C. §§ 371 and 2342; and to further that illegal enterprise, has likewise engaged in a deliberate, carefully planned and executed scheme to structure both his cash purchases of bulk cigarettes and the subsequent cash proceeds of his illegal bulk cigarette sales, in violation of 31 U.S.C. §§ 5324 and 5331. Law enforcement surveillance of Bernard EKELEMU's business, Tobacco Country / Gulf Gas station

has confirmed that Bernard EKELEMU's cigarette purchase volume – over $5,000,000 in 2015-2016 – is wholly at odds with the customer traffic at Bernard EKELEMU's gas station.  Records maintained by banks and various wholesale cigarette distributors and vendors indicate that Bernard EKELEMU consistently structured both his cash deposits into his business's bank account, and structured his cash payments when making bulk cigarette purchases.

62.   Surveillance has confirmed that Bernard EKELEMU regularly transported bulk cigarettes to and from the SUBJECT LOCATION in Springfield, and that EKELEMU also used the SUBJECT LOCATION to transfer large quantities of cigarettes – typically concealed in black plastic bags – to LEE prior to LEE's transport of those same cigarettes north out of the Commonwealth of Virginia.

63.   Your affiant respectfully submits that this affidavit supports probable cause for a warrant to search the SUBJECT LOCATION (more particularly described in **Attachment A**) and to seize the items described in **Attachment B**.  Accordingly, I request authority to search the SUBJECT LOCATION for the items described in **Attachment B**.

Task Force Officer Jennifer M. Elliott
Special Deputy U.S. Marshal
HIDTA Financial Initiative

Subscribed to and sworn before me
On this __19__ day of January, 2017.

The Honorable Theresa C. Buchanan
United States Magistrate Judge

## ATTACHMENT A

### Location to Be Searched

This affidavit is submitted in support of search warrants for the following locations:

a. **Mini U Storage** is located at **7711 Loisdale Road, Springfield, Virginia 22150,** in the Eastern District of Virginia, and is further described as a self-storage business containing rentable storage units inside buildings. The main office building is a red brick-front building that faces Loisdale Road. The front doorway is a single glass door with dark color trim. The name Mini U Storage is displayed on a large pole sign at the left front corner of the customer parking area. The sign is visible from Loisdale Road. The address number 7711 is displayed to the right of the front door entrance. The storage unit buildings have a combination of garage door exterior units and/or small interior units. The unit to be searched is inside a larger building located in the left rear corner of the facility. The building that houses the unit is a concrete block building that is white in color. The entrance to the storage unit building is a single light tan door with a single window. There are numbers displayed over the door, 534-554. The unit to be searched, **No. 536,** is located inside this building on the left side of the hallway. The door is light tan in color and displays the number 536 on it. The unit is locked with a key opening pad lock.

 






## ATTACHMENT B

## DESCRIPTION OF ITEMS TO BE SEIZED

Evidence, fruits, and instrumentalities of money structuring and conspiracy to traffic contraband cigarettes, in violation of Title 31, United States Code, Sections 5324 and 5331, and Title 18, United States Code, Sections 371 and 2342, more particularly described as follows:

1. Books, records, ledgers, journals, statements, invoices receipts, records of financial transactions, billings, balance sheets, notes and work papers, and other papers related to income and expenses;

2. Financial records and records of money transfers and transmittals, however maintained, including but not limited to banking records, tax records, employment records, payroll records, investment records, financial ledgers, related work papers, correspondence with accountants or other tax preparers, and safe deposit keys.

3. Documents relating to the purchase of cigarettes and records or other document related to the sales or other distribution of cigarettes, and bulk cigarettes themselves.

4. Records of any asset acquired in part or whole in cash.

5. Correspondence and documents identifying banking or money laundering laws or regulations, or information related to the legal requirements regarding Currency Transaction Reports, Form 8300s, or money orders regardless of the date of creation.

6. Address and/or telephone books, rolodex indices and papers reflecting names addresses, telephone numbers, fax numbers and/or telex number of conspirators, associates, customers, financial institutions and other individuals or businesses with whom a financial relationship exists.

7. Cash or monetary instruments.

8. Computers, Cellular Phones, and other Storage Mediums:  This warrant authorizes the seizure and search of any computers, cellular phones, or storage medium capable of being used to commit, further, or store evidence of the offenses listed above. Mirroring, imaging, and/or replication are also authorized.  For any computer, cellular phone, or storage medium whose seizure and search is authorized by this warrant, and any computer, cellular phone, or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter "COMPUTER"):

   a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

33

c.  evidence of the lack of such malicious software;

d.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

e.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

f.  evidence of the times the COMPUTER was used;

g.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

h.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

i.  records of or information about Internet Protocol addresses used by the COMPUTER;

j.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

k.  contextual information necessary to understand the evidence described in this attachment.

l.  Routers, modems, and network equipment used to connect computers to the Internet.

m.  As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

n.  The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

o.  The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## APPENDIX A

## SUBJECT LOCATION SURVEILLANCE VIDEO SCREEN CAPTURES

08-28-16



9-18-16

 

35

**9-18-16**





**10-09-16**





**10-09-16**



**10-23-16**



**11-20-16**

